The final case this morning is number 13-1660, In Re Ross. Ms. Jacobs-Medway, is that the way it's pronounced? My name is Medway, Your Honor. Medway, okay. I'm here on behalf of the Ross Appellants. If it pleases the Court, there are two points that I would like to make. I know that the Court is familiar with the brief, but the first issue that I would like to address is, did the board misread Aikida? And if so, granted that misreading, should it be found that the examiner did not establish a prima facie case of obviousness, then the decision should be remanded to the examiner for examination in light of a proper reading of Aikida. The solicitor contends, based solely on Aikida, that it was common knowledge at the time of the invention claim in the application to display a customer's accumulated discount points after the initiation of the purchase of fuel. And that, in particular, the... Can I start over again? Sure. With apologies. The solicitor contends that it was common knowledge, based on Aikida, to display an available accumulated discount at the time that a purchase is initiated. Aikida doesn't show that. What Aikida shows is that in an online shopping mall, when the customer enters, if you will, into the site, there is a display of available accumulated discounts from each store within the online shopping mall. The potential purchaser then is not initiating a purchasing transaction. The purchasing transaction... Can I just ask? I thought I was remembering... I think I'm remembering. Just tell me if this is wrong. The way the online shopping mall description in Aikida reads, it says something like, when a customer decides to make a purchase, the customer goes to the mall and then navigates through to find the thing. But it's... I thought there was some clause. Am I not remembering this right? That says something like, when the customer decides to make a purchase? If you take a look at the figures and the explanation, in fact, when the customer goes to the homepage, which is where the discount information is displayed, there is, in fact, no purchase transaction happening. If you read the claims and the flow, the transaction actually is initiated once the purchaser, or the potential purchaser, enters one of the stores and pushes the shopping button. Just to follow up on Judge Tron's question, this is at column two, line 51 of A755. Aikida, at that part in its written description, states, when a customer decides to buy goods through a homepage of an online shopping mall, according to the present invention, the number of effective accumulated points of the customer issued by a number of shops to the customer is displayed on the customer's terminal. And I believe the patent board signed this part of Aikida as lending support to the idea that it was known that when a customer is deciding to buy something, it would be notoriously well-known to display whatever accumulated discount points that customer might have. There are two responses to that, Your Honor. If, in fact, you look at what happens during the transaction, there is not a purchase decision at the time the home screen is adopted. You can't even see what goods there are to be purchased. Well, what about figure 13 of Aikida? Your Honor, if I might. Figure 13 shows the quantity purchased, the 10 units, and then it permits an election between redeeming all points, which is one, two, I'm sorry, one is all points deposited, two is all points redeemed for discounts, three is the number of points partially redeemed for discounts, and four is the donation for charity. The mistake that was made by the solicitor in the patent office is to think that the number four was the amount of the discounts available. Instead, that's just an identification of one of the options that can be elected. That's not the point. Well, that's what you say, that the problem is we have to review for substantial evidence, and why isn't figure 13 substantial evidence to support what the Board said? Because figure 13 does not show the available points for discount. Well, but the Board concluded that it did, right? If you take a look at the plain language of the figure, and if you look at the description of the figure, it's clear that's not what happened. That's plain error. It's just wrong. Does figure 6 show the... Yes, figure 6 shows the available discounts. That's the home screen. It shows the stores and the online mall, and the points available from each. At this point, no purchase has been initiated. The user hasn't even entered a store. This is the only screen on which all of the points are displayed, and it's before, as you go through the sequence, any purchase is initiated. Figure 11, if it pleases the Court, shows the shopping input screen that's displayed after the customer selects a shop. The customer going into the shop is now capable of initiating a purchase and placing an order here for space food, but the amount of the product to be purchased is put in. There's nothing there that displays the available discounter points, and that's the point when the transaction, the purchase transaction, is in fact initiated. You can't initiate a purchase transaction until you're in the store. But, so for figure 13, all these different categories relating to something about the points, you're saying there's a lot of different iterations relating to the points, but none of these different iterations display the actual number of points. Yes, sir. How would you know what number to put in partially redeemed if you didn't know what the total number of points was? That's one of the problems with IKEDA. You have to negotiate away from the store and leave the store and go back to screen 6. If you will, I think it's one of the reasons why IKEDA, in fact, is not well-known or commonly known. It's a patent that you can find if you search, but it's an awkward system that does not have the benefit of the claimed invention in the Ross application. It's plain error to say that figure 13 shows the points available for discount. I mean, that's not a matter of substantial evidence in weighing it if even the solicitor wins. It's just wrong. Is this the point of novelty that's described in the Ross patent application? I thought the novelty, the whatever, I guess inventive concept is the notion of automating a system so you don't have to keep around all these scraps of paper or discount cards. Now it's all just automated. The inventive concept of the claim, Your Honor, is that what Ross does is it presents at the discount and the option to elect to exercise some, all, or none for the purpose of maximizing the benefit of the discount. The some, all, or none, that feature is taught by IKEDA, right? That's not something that's in dispute here. IKEDA teaches the availability of using some, all, or none on a discount in an online shopping mall, but the display is at a different point in time. So why wouldn't it be obvious to have the display on figure 13 if it's not already there? I mean, it seems to be kind of trivial to display the total amount of points at the same time you're giving the people a choice to redeem all points or some points or to donate some points or all points. Your Honor, I don't think it's obvious it would have been done. It's interesting to note that IKEDA is prior art to McCall and Nicholson. If it was so obvious at the time of McCall and Nicholson, you would think that McCall and Nicholson would have that feature. There was no motivation to combine. Why isn't there a motivation in figure 13 to display all the points if you're asking people to choose how many points to redeem? Because there is a factor of being able to see the options and calculate the options. Well, that's what I'm saying. What makes it obvious and what creates the motivation is that if you're going to be choosing whether to redeem all points or some points or to donate points, that creates the motivation to display the total number of points available at the same time, no? Your Honor, official notice was taken of IKEDA. IKEDA does not show what it was said to show. But more to the point, if this was obvious and if IKEDA was so well known and commonly known, when McCall and Nicholson came along with what is cited as a prior art, it would be perfectly obvious that McCall and Nicholson should have included this as well. But they don't. And they don't because this was not an obvious combination. What you have is a situation here where, in addition to the argument that we make about the prima facie case of obviousness, is that there is commercial success here. And it's a commercial... at the time that these choices are made. What evidence is there that the commercial success results from that? There is the evidence, Your Honor, of the use of this particular feature which gives the fuel perks program particular advantages in a competitive context. You have evidence of increasing market share even... What is the evidence that the market share increase is attributable to this particular feature? What you have, Your Honor, is the evidence that... First, you have the number of customers who are actually choosing to use this feature to secure a full tank of gas. So that you come in, 25% of the people who have the option of using the discount elect not to. They elect not to because you have significant numbers then deciding to maintain and increase the available discount to the point where they can bring in, if you will, the largest SUV that they have when the vehicle is running on fumes to maximize the value of the discounts available for the sake of maximizing the return, basically, on their investment. You have, in the Leuco Ask David, some 700,000 people who, over a period of time, are taking this option and using the election feature to secure something like 2.5 million gallons of free gas. You have a situation where you have evidence of the testimonial from customers talking about the election feature and the ability to accumulate and decide when to take the discount and when not to take the discount. The solicitor relies on In Re Wang to talk about the requirement of the applicant to basically discount all of the other factors that could have contributed to commercial success. There's nothing in Wang that says that commercial success must be solely predicated on the invention and not be claimed in the application. There has to be a nexus between commercial success and the claimed invention, clearly. But to say that the applicant is required to discount every other factor places an impossible burden on applicants, which would basically preclude any applicant. Well, I think In Re Wang basically said, as an example of being able to establish the nexus, which is the applicant's burden, the applicant could provide customer surveys, for example, where in those surveys the customers would be testifying that, yes, because of the merits of this claimed invention, because I love being able to see the display of my accumulated discount points when I am purchasing gasoline, that's why I come to this gas station and I'm a proud member of the Fuel Perks Program. Something like that. And the testimonials do essentially say that, that are provided in Exhibit A to the LUCO affidavit. And if you look at the other material in the LUCO affidavit, and again, if you look at – Where does this affidavit say the customers used this program because they could see the number of points available at the time they made the choice? That's not what it says, Your Honor. Yeah, that's the problem. What it says is this is the program and they like the discount feature. And the discount feature works because this is how the program is set up. And referring to Appendix 527, you have, I like the choice – I like having the choice to use my discounts right away or save them once I have a larger discount. Well, that's in the prior art, isn't it? Without the information that permits the fuel purchaser to decide how best to strategize the use of the discount. I like that you can accumulate your discount – your fuel perks and decide to redeem them right away or wait until you have a bigger discount. That's based on the information provided at the pump, at the point of sale. Nicholson doesn't provide the available discount at the point of sale. What Nicholson does is it provides the information about what the discounted price is once the purchase is made. The affidavit allows you to save the points for use, right? Yes. I think you're into your rebuttal time.  Thank you, Your Honor. Thank you. Is that how you pronounce it? It's fine. Unt, unt, unt, unt. Okay. May it please the Court, the Board and the examiner correctly found these claims obvious. The substantial evidence supports their fact findings as to the teachings of the prior art, Aikida, Nicholson, and McCall, as well as the motivation to combine these references. Can you focus on what we've spent so much time talking about? And that is the twice-dated finding, the timing number, and about Aikida. And the last sentence says, the order screen – this is figure 13. The order screen displays the amount of points the customer has to select from to be able to use for the current order. A, is that wrong? And B, does it matter if it's wrong? Well, A is that the Board's finding is correct, and it does cite figure 13 for that finding. And while figure 13 could have more in it, it does show the points that are available. If you look through this figure, sort of the context of the figure shows that each time you have a category, like you have a shop, and we know that that's space development from the prior figures. We have the code, okay, that's 5002. The goods number, that's on the right-hand side of it. The goods name, space goods on the right-hand side of it. The quantity, okay, that's 10. So then we get down points for. The natural reading of that is that displays the amount of points that are available to the customer to use at that point. In the corresponding textual part of the specification – I'm sorry. You're indicating that there are four points available? Or is four, like 1, 2, 3, an itemization of a particular box? Well, that would be a very odd way of interpreting the four based on the context of the rest of the figure because, you know, everything sort of goes in order. Like payment goes down 1, 2, 3. And then if you're looking at all points deposited 1 and then next to that 2, then it is all points redeemed. And then 3, partially redeemed for discount. And the number of points next to the partially redeemed for discount is the amount you have to enter if you want to partially redeem it. To then say that then 4 refers to the fourth option, it would be a very odd reading of this figure to me. What's ID or LD mean after donation? Oh, I think it's identity. So the specification describes that – Oh, who you're going to donate it to. Right. So that's another reason not to view 4 as for donation, which is that if you do want to donate points, the specification explains that you enter the identity of the person that you want to donate the points to, and that takes you to another screen to handle the donation process. So you read the 4 as actually the number of points that's available. Yes, Your Honor. Some of the numerical items here refer to particular boxes, right? And some, in your view, refer to an example of what the number would be. And the argument basically is because the number 4 precedes the use of the number 1, 2, 3 down there, it's not referring to the box number but to the number of points. Yes, Your Honor. Like immediately above the points 4 is quantity 10, and we know from the prior – from figure 11 that for space food they want 10 of the space foods. So it's consistent with that kind of formatting to read the points 4 as referring to the number of points that are available to the customer to use at that point. And this is, you know, there may be other readings, but this is certainly a reasonable reading, and the Board, that's all that the standard of review requires, that the Board has a reasonable reading. But beyond that, there's a lot of other evidence to support the Board's findings here, which is all the limitations. This is the only disputed limitation, and that's presenting the available discount level to the customer. There's no dispute that the first five limitations in the Board's numbering system were taught by Colin Nicholson. There really doesn't seem to be any dispute that ACADA teaches the remaining three limitations. So we have figure 13. If we want to go back from figure 13, we have the Board's finding in finding 10 that if you wanted to look at the transaction a little bit more broadly, that when you start the transaction, if you're at the initial screen that displays the stores, we have the explicit statement in the specification at that point that when the customer desires to buy goods, they see the points. So you could have a slightly broader rating if figure 13 isn't sufficient. But beyond that, we also have a backup of Nicholson, which the examiner found, and the Board adopted the examiner's findings in its opinion, that Nicholson teaches displaying the discount level as well before the transaction is finished and after it started. And that wasn't the primary ground that the Board relied on, but it's another backup, one more backup, for the grounds that the Board did rely on. And all that is a lot of it in the second examiner answer at A668 through 670, where the Board examiner found that Nicholson taught presenting the discount or the discounted gasoline price to the customer, which the examiner found meets the limitation of presenting the available discount level. That's the limitation of this issue. And there was no dispute prior to this briefing as to whether the discount or the discounted price met the discounted level limitation. In addition to the prima facie case, substantial evidence also supports the Board's fact findings on commercial success, that Roth did not present sufficient evidence of commercial success, the nexus between the evidence of commercial success and the claimed invention. Of all the evidence that Roth relies on, the commercial success that's alleged could very equally well, could well have been due to either the prior art or to extrinsic factors. We don't assert that the applicant has to disprove all the other factors that might have caused commercial success. We don't think the law says that. And also, that's not what the Board required here. There needs to be, though, a nexus. There has to be some proof, legitimate proof, that the success is a direct result of the claimed invention. And that's, for example, in DBC, the direct result language. Or I believe it's also the driving force. So there are some analogies to the injunction context, for example, in the Apple-Samsung case. But there's nothing like that here. Otherwise, one could certainly simply say, well, my invention seems to be successful, and the Patent Office doesn't have the tools to do discovery or to find out what the actual evidence is that would cause the commercial success. So we need to rely on the applicants to provide it. Here they relied on, first, the number of, the amount of fuel that was awarded and the number of households that participate in the program. Well, that's fine, but that has nothing to compare with other loyalty programs or the prior art that teach many of these limitations. McCall and Nicholson taught essentially everything other than the discount limitation. I guess the applicant is trying to say that people, the customers, are using this option. So there's an inference there that the customers, if they're using it in large numbers, that they like this option, they like this feature, they want to be able to use it, it's valuable. The use isn't enough under this court's precedent. And practically speaking, you may use something. I think in the brief I gave the example of the car. Like you may have a bass feature in your car, but that doesn't mean that, and I use it every time I use the radio, but I couldn't care less whether my car actually had it. There needs to be something that, for example, if they had given customer, a lot of customer testimonials that actually said, we like using this program as opposed to the other prior art programs because it has this discount election feature. That's something that we would have had to take seriously. The problem is that the discount election feature is shown in the QEDA. The only thing, even according to them, is the display of the total number of points, and there's no indication that people are using this feature because of the pre-display of the whole number of points. Yes, sir, and I think it is more important to focus more narrowly on that presenting feature than the whole discount election, which is also something that their evidence fails to do. The discount election existed in the prior art, right? Right, and the discount election existed in the prior art. You could simply save up your receipts and choose whether or not to use all of them. That was in the prior art. That's been taught by McCall and Nicholson. The system, the idea of linking gasoline discounts to a points program, that existed in the prior art. I guess the basis of your 103 is that IKEDA teaches not only the election of some, none, or all of the discount points, but IKEDA also teaches the display of the total amount of discount points, right? Yes, Your Honor, and that's true. So then, in one sense, every single element of the claim is in the prior art somewhere. It's either in McCall and Nicholson or it's in IKEDA. And then, if that's the case, just based on the colloquy you just had with Judge Dyke, would the PTO be saying, oh, everything's in the prior art, so there is no unique characteristic of the claim convention, so you can never point to any kind of secondary consideration evidence for the unique characteristics of the claim convention in a circumstance where every single element is in the prior art. Is that what you're saying? Well, no, Your Honor, and the board didn't do that here. And I think reading through the court's case laws, you kind of need to look at the commercial embodiments that are out there of the prior art, and the closest ones would be, for example, this Nicholson and McCall that we know of, because we don't know anything about any other commercial embodiment from the evidence that they gave us. We don't know anything. We just know that some other stores have some kind of discount program, and we know some of the dates that that started, but we have no idea, based on the evidence that's applied, whether those competitors, what the features of their programs are, whether they have any kind of discount election they made, how automated they are. We don't know, also, even what the pricing is, which I think is hugely significant here. It could be that people who do use this discount election or who do use the display do so because they like, maybe this system offers 30 cents off per gallon and the others offer 20 cents off per gallon. We really don't have enough evidence to make anything other than just a conjecture as to what this invention does compared to the other commercial embodiments of the prior art that are out there. And based on that, there's certainly not enough evidence to support a finding that secondary considerations outweigh a prima facie case, especially where the prima facie case here is so strong. Okay. Do you need further? Yes, Your Honor. Thank you, Ms. Simons. Ms. Nicholson, meanwhile, you have two minutes. Your Honors, I know my time is short. We do dispute that Nicholson teaches presenting the discounts at the time the purchase transaction is initiated. No, Nicholson, Your Honor. Oh, I'm sorry. Ikea as well, but also Nicholson. The commercial success evidence includes market share evidence, and the market share of Giant Eagle with the Fuel Perks program continued to increase even after direct competitors in its marketplace introduced other discount fuel programs. That's paragraph five of the second LUCO affidavit. Obviously, the fact that there are other competitors out there did not prevent people from continuing to go to the Fuel Perks program because it is different than the other programs out there, and it offers a superior discount program, which involves presenting the information, providing the election options so that the customer can decide how best to maximize the available discount. With respect to the reasonableness or non-reasonableness of the interpretation of the figure 13, there are four options in Ikea that are in the store in the online mall. One, redeem all of the points. Two, redeem none of the points. Three, redeem some of the points. Four, donate to charity. That's your one, two, three, four. The four comes from nowhere else. There's no way to read the four as coming from anywhere else. Not reasonable. Are there any other questions? I think not. Thank you very much. Thank you. I thank both counsel. The case is submitted, and that concludes our session for today.